# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.* [UNDER SEAL]<br><br>            Relator,<br><br>v.<br><br>[UNDER SEAL],<br><br>            Defendants. | **CIVIL ACTION NO.** SC 24.2985 JWB/ELW<br><br>**COMPLAINT PURSUANT TO FALSE CLAIMS ACT, 31 U.S.C. § 3729** *et seq.,*<br><br>**JURY TRIAL DEMAND**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER IN PACER** |



SCANNED
JUL 26 2024
U.S. DISTRICT COURT MPLS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.*<br>H REMIDEZ, LLC<br><br>Relator,<br><br>v.<br><br>FORESIGHT BANK; PROFINIUM, INC.; THE LOAN SOURCE, INC.; ATLANTIC UNION BANK; CHICKASAW COMMUNITY BANK; CITIZENS BANK AND TRUST; COMMUNITY WEST BANK, N.A.; CORNERSTONE COMMUNITY BANK; DAKOTA WESTERN BANK; FARMERS AND MERCHANTS BANK; FIRST STATE BANK; FIRST COMMUNITY BANK OF CENTRAL ALABAMA; FLATWATER BANK; GEORGIA PRIMARY BANK; INSBANK; LEGACY BANK & TRUST COMPANY; LEXICON BANK; LIFTFUND, INC.; MERCHANTS BANK OF INDIANA; MISSION VALLEY BANK; OSGOOD BANK, d/b/a OSGOOD STATE BANK; THE BANK OF COMMERCE; and VIBRANT CREDIT UNION<br><br>Defendants. | CIVIL ACTION NO._____<br><br>**COMPLAINT**<br>**PURSUANT TO**<br>**FALSE CLAIMS ACT,**<br>**31 U.S.C. § 3729** *et seq.,*<br><br>**JURY TRIAL DEMAND**<br><br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)(2)**<br><br>**DO NOT ENTER IN PACER** |

## *QUI TAM* COMPLAINT

### INTRODUCTION

1.        This is an action to recover damages and civil penalties on behalf of the United States arising from false or fraudulent statements, records, and claims made by the Defendants related to the Paycheck Protection Program Liquidity Facility ("PPPLF" or "Liquidity Facility").

2.        The Federal Reserve Bank of Minneapolis ("Minneapolis Fed") designed the PPPLF program to make lending under the Payroll Protection Program ("PPP") more profitable as an incentive for financial institutions to participate.

3.        The Liquidity Facility extended credit at interest rates 40 percent below government rates – an interest charge of $9.59 a day when borrowing $1 million – without any fees or liability. To participate, the Federal Reserve required lenders to secure these low-interest credit extensions with PPP loans owned and possessed.

4.        To obtain the taxpayer-subsidized advances, lenders certified they complied with each provision of the PPPLF program, followed Small Business Association ("SBA") rules and used PPP loans they had already issued and owned as collateral.

5.        Lenders also acknowledged that any knowing misrepresentation required immediate repayment and may result in a referral to law enforcement for criminal or civil action.

6.        Contrary to their agreements and certifications, 50 lenders obtained $716.9 million from the Federal Reserve by pledging collateral they certified as PPP loans when they were not.

7.      Some of the so-called PPP loans lenders pledged originated before Congress enacted and the President signed legislation authorizing SBA's emergency lending program. Other collateral was issued before the lender seeking taxpayer-subsidized advances ever issued a PPP loan.

8.      Their false certifications enabled Defendants to receive $716.9 million, to which they were not entitled.

9.      This action seeks to recover damages and civil penalties on behalf of the United States through the False Claims Act ("FCA"). The FCA provides that any person who knowingly submits or causes to be submitted to the Government a false or fraudulent claim for payment or approval is liable for a civil penalty and three times the amount of the damages sustained by the Government.

## PARTIES

10.      **Relator H Remidez, LLC** is a Texas limited liability company. Dr. Herbert Remidez, Jr. is the president, secretary, and treasurer of the company. Dr. Remidez holds a Ph.D. in Information Science and Learning Technologies from the University of Missouri at Columbia. He has been employed as a faculty member in the Satish and Yasmin Gupta College of Business at the University of Dallas since 2010, where he currently serves as a tenured Associate Professor, the Director of the MS Business Analytics degree program, and the Director of the new MS Data Science and AI degree program. From 2014 through the present, Dr. Remidez has taught business analytics courses with a focus on cloud computing, big data analytics, predictive

modeling, advanced business analytics, and artificial intelligence. He used data analytics to identify the fraud specified herein.

11.     **Defendant Foresight Bank ("Foresight")** is a state-chartered institution based in Plainview, Minnesota. In December 2022, it had three locations and assets of $329.6 million.

12.     **Defendant Profinium, Inc. ("Profinium")** is a state-chartered institution based in Truman, Minnesota. In December 2022, Profinium reported assets of $514.9 million. It is a subsidiary of Profinium Financial Holdings, Inc. in Fairmont, Minnesota.

13.     **Defendant The Loan Source, Inc. ("TLS"),** a Delaware corporation, is one of 14 companies with a Small Business Lending Company license from the SBA, enabling it to participate in various small business loan guarantee programs. The New York City-based lender sought and received advances from the Minneapolis Fed.

14.     **Defendant Atlantic Union Bank ("Atlantic")** is a state-chartered bank based in Richmond, Virginia, with 115 branch offices. As of June 30, 2022, it had assets of $19.5 billion. The bank, a Virginia corporation, is a subsidiary of Atlantic Union Bankshares Corporation.

15.     **Defendant Chickasaw Community Bank ("Chickasaw")** is an Oklahoma state-chartered bank. As of June 30, 2022, it had assets of $417.9 million. It is a subsidiary of Chickasaw Banc Holding Company in Oklahoma City.

16.     **Defendant Citizens Bank and Trust ("CBT")** is a state-chartered bank in Frostproof, Florida. In 2022, it had assets of $1.3 billion. Citizens Bank is a subsidiary of Citizens Banking Corporation, a bank holding company headquartered in Frostproof.

17.    **Defendant Community West Bank, N.A. ("Community")** is a subsidiary of Community West Bancshares, a bank holding company based in California. A national banking association, Community provides services through seven branch offices in Goleta, Oxnard, Paso Robles, San Luis Obispo, Santa Barbara, Santa Maria, and Ventura, California. It has been a preferred SBA lender since 1990. It had assets of $1.1 billion in 2022.

18.    **Defendant Cornerstone Community Bank ("Cornerstone")** is a California-chartered community bank in Red Bluff, California. It is a subsidiary of Cornerstone Community Bancorp and reported net income of $7.9 million in 2021 with assets of $585.6 million.

19.    **Defendant Dakota Western Bank ("Dakota")** is a state-chartered bank in North Dakota. Based in Bowman, the bank had assets of $326.3 million as of June 30, 2020. It is a subsidiary of Dakota Western Bankshares, Inc., a bank holding company based in Bowman, North Dakota.

20.    **Defendant Farmers and Merchants Bank ("FMB")** is a state-chartered bank in Georgia with three locations. Based in Lakeland, Georgia, the bank had assets of $663.8 million as of June 30, 2022. It is a subsidiary of FMB Bancshares, Inc., a bank holding company based in Lakeland, Georgia.

21.    **Defendant First State Bank ("First State")** is a state-chartered bank based in Clute, Texas. It has three locations. Established in 1958, the bank specializes in commercial banking and is a member of the FDIC. As of June 30, 2022, it had assets of $289.2 million.

22.      **Defendant First Community Bank of Central Alabama ("First Community")** is a state-chartered bank based in Wetumpka, Alabama. The bank had assets of $541 million as of June 30, 2022. It is a subsidiary of Central Alabama Bancshares, Inc.

23.      **Defendant Flatwater Bank ("Flatwater")** is a state-chartered bank based in Gothenburg, Nebraska. As of June 30, 2022, it had assets of $210.9 million. It is a subsidiary of Williams Financial Corp., a Nebraska bank holding company.

24.      **Defendant Georgia Primary Bank ("Georgia Primary")** is a state-chartered commercial bank based in Atlanta. Established in 2007, the bank has a branch office in Cumming, Georgia. It is a subsidiary of Primary Bancshares Corporation. As of June 30, 2022, the bank had assets of $281.3 million.

25.      **Defendant InsBank ("InsBank")** is a state-chartered bank based in Nashville, Tennessee. As of June 30, 2022, it had assets of $716.7 million. It has two locations.

26.      **Defendant Legacy Bank & Trust Company ("Legacy")** is a state-chartered bank based in Mountain Grove, Missouri. It has six locations in two states. The bank had assets of $1 billion as of June 30, 2022.

27.      **Defendant Lexicon Bank ("Lexicon")** is a Nevada-chartered commercial bank based in Las Vegas. In 2021, the bank's profitability was driven by the recognition of $4.5 million of PPP loan fees. In 2021, it had assets of $247.1 million.

28.      **Defendant Liftfund, Inc. ("Liftfund")** is a Community Development Financial Institution and Community Development Corporation based in San Antonio,

Texas, that supports small business owners with limited access to capital through loans and technical support. It is a Texas non-profit.

29.    **Defendant Merchants Bank of Indiana ("Merchants")** operates under an Indiana banking charter. It has six depository branches located in Indiana: Carmel, Indianapolis, Lynn, Spartanburg, and Richmond. It is a subsidiary of Merchants Bancorp. A participant in various SBA lending programs, the bank had assets of $10.8 billion in 2022.

30.    **Defendant Mission Valley Bank ("MVB")** is a state-chartered commercial bank in California. Based in Sun Valley, California, the bank is a subsidiary of Mission Valley Bancorp, which posted record net income of $5 million in 2020. During the pandemic, the Bancorp's assets increased to $576 million, a $99.7 million increase.

31.    **Defendant Osgood Bank, d/b/a Osgood State Bank ("Osgood"),** is a state-chartered financial institution in Ohio. Based in Osgood, Ohio, it is a subsidiary of OSB Bancorp, Inc., a financial holding company. As of June 30, 2022, the bank had assets of $361.2 million.

32.    **Defendant The Bank of Commerce ("TBC")** is a community bank based in Idaho Falls, Idaho. It has about $1.9 billion in assets, has some 26,000 customers, and employs 200 people. It is a state-chartered bank with 16 locations in two states.

33.    **Defendant Vibrant Credit Union ("Vibrant")** is a federally insured state-chartered credit union based in Moline, Illinois. In 2022, it had 46,345 members, total assets of $1 billion, outstanding loans of $755.6 million, and deposits of $825.2 million.

## JURISDICTION AND VENUE

34.        This Court has jurisdiction over the subject matter of this action pursuant to

28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732.

35.        This Court may exercise personal jurisdiction over Defendants pursuant to

31 U.S.C. § 3732(a) because Defendants transact business in the District of Minnesota.

36.        Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because all

Defendants can be found in, reside in and/or have transacted business in the District of

Minnesota.

37.        Relator knows of no other FCA complaints that have been filed against

Defendants alleging the same or similar actions for the time period at issue. Additionally,

Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B).

## REGULATORY OVERVIEW

### The Federal False Claims Act

38.        The Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* reflects Congress'

objective to "enhance the Government's ability to recover losses as a result of fraud

against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the

FCA establishes liability for an individual or entity that:

> (A)      knowingly presents, or causes to be presented, a false or
>          fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used a false
>          record or statement material to a false or fraudulent claim; and

(C) knowingly makes, uses, or causes to be made or used, a false

record or statement material to an obligation to pay or transmit

money or property to the Government, or knowingly conceals or

knowingly and improperly avoids or decreases an obligation to

pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1)(A); 31 U.S.C. § 3729(a)(1)(B); 31 U.S.C. §(a)(1)(C); 31 U.S.C.

§(a)(1)(G).

39.     The FCA defines "knowing" and "knowingly" to mean that a person (1) has

actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity

of the information; or (3) acts in reckless disregard of the truth or falsity of the

information. 31 U.S.C.

§ 3729(b)(1). No proof of specific intent to defraud is required and an innocent mistake is

not a defense to an action under this act. *Id.*

40.     In addition to treble damages, the FCA provides for civil penalties for each

violation.

### The CARES Act and the Paycheck Protection Program

41.     The Coronavirus Aid, Relief and Economic Security Act ("CARES Act")

was enacted for the purpose of providing fast and direct economic assistance for

American workers, families, small businesses and industries. It was passed by Congress

on March 25, 2020 and signed into law on March 27, 2020. At over $2 trillion, it is one

of the largest rescue packages in U.S. history. The law allocated $150 billion to states and

localities battling the pandemic and $130 billion more for the healthcare system.

10

42.     The Paycheck Protection Program, instituted pursuant to the CARES Act, was designed to help small businesses meet their payroll, along with certain other qualifying expenses, during the unprecedented shutdowns of the early COVID-19 pandemic. The PPP program depended on private lenders making loans to small businesses on behalf of the U.S. government.

43.     Private lenders originated 11.3 million taxpayer-backed PPP loans valued at $785.7 billion. Upon the recommendation of the lenders, taxpayers have fully or partially forgiven 96 percent of these loans. Fees from taxpayers to private lenders, including Defendants, for processing loan applications and ensuring compliance with federal law and regulations varied between 1 percent and 5 percent of the loan value.

### The PPPLF Program

44.     In a crisis, the Federal Reserve has singular and broad authority to provide liquidity directly to banks and non-commercial entities through a discount program or lending facility. Under Section 13(3) of the Federal Reserve Act, these emergency programs are designed by the Federal Reserve and approved by the Treasury Secretary. No other oversight is required.

45.     In 2020, the Minneapolis Fed was given a special assignment to set up and lead the PPPLF emergency lending facility. At the direction of the Federal Reserve and the U.S. Department of the Treasury ("Treasury"), the Minneapolis Fed designed the program to increase lending capacity among SBA-approved PPP lenders.[1]

---

[1] *See* https://www.frbdiscountwindow.org/generalpages/emergency%20credit%202020

46.     It began lending to banks, savings associations, and credit unions on April 16, 2020. Three weeks later, on April 30, 2020, it expanded the program to include any private sector lender making PPP loans

47.     By May 2021, the lending facility fashioned by the Minneapolis Fed had provided more than $80 billion to bank and non-bank lenders, with more than 90 percent flowing to community banks – institutions with $10 billion or less in assets.

48.     To obtain a PPPLF loan, the Federal Reserve required lenders to complete a letter of agreement in which an authorized representative warranted, represented, covenanted, and certified that each PPP loan pledged as collateral:

> Complies with all requirements of the PPP, including without limitation any rules or guidance issued by the SBA implementing the PPP, and any requirements set forth in any agreement the Borrower is required to execute by the SBA in connection with the PPP.

49.     In an April 2020 PPPLF term sheet, the Federal Reserve further explained the terms and conditions:

> **Eligible Collateral:** Only PPP Loans guaranteed by the Small Business Administration ("SBA") are eligible to serve as collateral for the Facility. An eligible borrower may pledge SBA-guaranteed PPP loans that it has originated or purchased.

50.     The Federal Reserve required each applicant to sign a letter of agreement that specifically said the advances must be secured by existing PPP loans. The lenders warranted and represented that each item of collateral met five criteria detailed in the PPPLF Letter of Agreement:

> a. Is a "covered loan" for purposes of 15 U.S.C. §636(a)(36) or (37);
> b. Complies with all requirements of the PPP, including without limitation any rules or guidance issued by the SBA implementing

the PPP, and any requirements set forth in any agreement the Borrower is required to execute by the SBA in connection with the PPP;

c. Has been duly approved under delegated authority for guaranty by the SBA;

d. Satisfied applicable Collateral requirements in the Circular; and

e. Was either (1) originated by [lender] or (2) purchased by [lender] in accordance with the SBA's requirements for the sale and purchase of whole PPP Loans (in either case, such that we are the beneficiary of the SBA's guarantee of such PPP Loans.)

51.     The Letter of Agreement signed by each Defendant added:

… all Advances made to the Borrower pursuant to the PPPLF shall become a recourse obligation if, in the sole discretion of the Reserve Bank, the Borrower [Lender] (i) has breached any of the representations, warranties or covenants made under the PPPLF Agreement or (ii) has engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advance under the PPPLF.

52.     The Federal Reserve also required each Defendant to submit a "Paycheck Protection Program Liquidity Facility PPP Pledge and Advance Request" form specifically identifying each PPP loan pledged as collateral. It added that the arrangement was subject "to the PPPLF under the terms and conditions of the PPPLF Letter of Agreement."

53.     The Agreement between lenders and the Federal Reserve emphasized that only PPP loans owned by these financial institutions could be used as collateral for the low-interest loans. The January 21, 2021 agreement said:

**Security for Advances:** Under the PPPLF, Advances must be secured by pledges of loans to small businesses originated or purchased by [the borrower] under the U.S. Small Business Administration's ("SBA") 7(a) loan program titled the Paycheck Protection Program ("PPP") … To qualify, for the PPPLF, PPP Loans must (1) be fully guaranteed as to principal and interest by the

13

> SBA, and have been either (2) originated by [the lender-borrower],
> or (3) purchased by [the lender-borrower] in accordance with the
> SBA's requirements for the sale and purchase of whole PPP Loans
> …

54.    The Federal Reserve did not allow lenders to use purchased loans as collateral for PPPLF advances until after April 30, 2020. An FAQ published as guidance said:

> May a PPPLF participant pledge a PPP loan that the borrower
> purchased from another PPP lender as collateral for an extension of
> credit under the PPPLF?
>
> Yes. Effective May 1, 2020, an eligible borrower may pledge PPP
> loans purchased from other lenders to the PPPLF. PPP loans must be
> purchased in accordance with the SBA's requirements for the sale
> and purchase of whole PPP loans.

55.    The Letter of Agreement, Frequently Asked Questions and other guidance published by the Federal Reserve required PPPLF participants to comply with all PPP requirements put in place by the SBA.

56.    On March 31, 2020, the SBA published the first information sheets for borrowers and lenders. The borrower information sheet said:

> **When can I apply?**
>
> -   Starting April 3, 2020, small businesses and sole proprietorships
>     can apply for and receive loans to cover their payroll and other
>     certain expenses through existing SBA lenders.

57.    Effective May 1, 2020, the SBA required the originating lender to immediately notify the agency of any PPP loan sale, including the name of the purchasing lender, the SBA loan number, the borrower name, the original loan amount, the current principal balance and the maturity date.

14

58.     The extension of credit by the Federal Reserve offered significant benefits to lenders. Interest was just 0.35 percent a year – $9.59 of interest per day on each $1 million borrowed. (At the time, the lowest rates available to banks from the government were between 0.6 percent and 0.9 percent a year.) Lenders were required to repay the advances to the Federal Reserve when the PPP loans serving as collateral were forgiven by the SBA or paid by the PPP borrower. The Federal Reserve limited the PPPLF advance to the outstanding balance of the pledged collateral.

59.     In addition, the arrangement included a valuable "non-recourse" provision that relieved the financial institution from liability or financial responsibility for defaults, limiting financial liability.

60.     The program required borrowers to submit a "PPP Pledge and Advance Request" form certifying that all loans included in the request were owned by and in the custody of the financial institution seeking the advance:

> I … am pledging, on behalf of the Borrower, the SBA PPP pool below as collateral to secure an advance that the Borrower hereby requests be made pursuant to the PPPLF under the terms and conditions of the PPPLF Letter of Agreement.
>
> On behalf of the Borrower, I further certify that: a) All loans included in the pledge are owned and are in the custody of the Borrower and maintained free of any claim adverse to the Federal Reserve Bank.

61.     The form completed by lenders specifically instructed them that PPP loans must be pooled by maturity date, adding that only one maturity pool may be submitted per advance request. The advance request to the Federal Reserve ended with a section

requiring lenders to list the collateral PPP loans, their loan numbers, their origination/issue date and their balance and maturity date.

62.     To comply with the PPPLF, federal regulations required financial institutions to pledge PPP loans with a value equal to the taxpayer-subsidized advance.

63.     A breach of any representation, warranty or covenant of the PPPLF agreement voided the non-recourse provision. A borrowing guide published by the Federal Reserve explained that violations of the lending agreement invalidating the non-recourse provision include:

> Agrees that PPPLF advances become recourse obligations if the borrower breaches any representation, warranty, or covenant of the PPPLF Agreement (including if any PPPLF collateral fails to satisfy the requirement of the PPP) or if the borrower has engaged in fraud or misrepresentation.

## ALLEGATIONS

### Background And Relator's Methodology

64.     Beginning in 2020, Dr. Remidez, the principal of the Relator, used his knowledge of advanced analytics in conjunction with various software packages that rely on artificial intelligence to review electronic information maintained by the SBA detailing PPP loans made to individuals, sole proprietorships and companies across the country.

65.     Dr. Remidez compiled data from Federal Reserve reports detailing advances to each lender participating in the liquidity facility. The data includes the institution's name, a unique identifier, the amount of the advance and the maturity date of the underlying PPP loans used as collateral.

16

66.     Though both the SBA and Federal Reserve datasets contain the lender name, the two government agencies used different naming conventions and identifiers, making an electronic comparison impossible. For example, the SBA data identified "The First National Bank of Fort Smith" with a unique identifier of 4322. The Federal Reserve dataset identified the same bank as First NB of Fort Smith with an RSSD identifier of 397540. The Treasury data also reflected an institution's new name after ownership changes.

67.     Resolving these differences to allow an accurate electronic comparison required creating a single identifier for each lender in the Federal Reserve and SBA datasets. This critical piece of information did not exist but was crucial to conducting an accurate analysis. Dr. Remidez created a single identifier for each institution by collating and then extracting information about each lender from data maintained by the Treasury, the SBA, the Federal Financial Institutions Examination Council, the Federal Deposit Insurance Corporation, the American Bankers Association and corporate websites.

68.     Over the last four years, Dr. Remidez has added updates published by the government to the Relator's data warehouse. SBA alone updated the PPP loan datasets approximately 52 times since the program began. The data warehouse maintained by Relator provides a historical record of each change. These archival records enhanced the analysis by showing name changes of lenders with new ownership. SBA does not maintain public archives of these updates. Without the historical record in the Relator's data warehouse, it is impossible to track these changes from public records.

69.    After structuring and organizing the data, Dr. Remidez developed the computer code necessary to compare the electronic information maintained by the Federal Reserve to the multiple data sets of PPP loan transactions. The PPP data, which is maintained by the SBA, contain individual fields showing the loan approval date, the lender, the borrower, the loan's term, the loan amount and the loan forgiveness amount, if any.

70.    The advanced analytics techniques applied included the use of various software packages that rely on artificial intelligence. The data preparation and modeling required to analyze the Federal Reserve and SBA data sets required trillions of electronic comparisons across gigabytes of data. The processing alone required hours to complete.

71.    The result identified lenders that obtained low-interest credit advances from the Liquidity Facility and the approval dates of the PPP loans pledged as security. A second computer-aided analysis verified that the electronic processes properly matched lenders in the Treasury and PPP loan datasets. Dr. Remidez then manually verified and further refined the results.

72.    Federal Reserve regulations required lenders to secure credit advances with PPP loans. Each institution's pooled PPP collateral was grouped and assigned a maturity date. Regulations required these maturity dates to reflect the term of the underlying loans.

73.    Dr. Remidez developed a set of software instructions to calculate the issue date of the PPP loan collateral by subtracting the term of the loan – either 24 or 60 months – from the pooled maturity date. A second set of instructions determined the date each lender first approved a PPP loan.

74.    The analysis totaled the PPP lending originated by each institution, which roughly corresponded to the size of the pools of PPPLF advances.

75.    As part of his analysis, Dr. Remidez reviewed academic studies examining PPP lending and the role of financial institutions. These studies found evidence of favoritism in lending, including "concierge" treatment from lenders with personal ties to borrowers.

76.    Although Relator used publicly available information, it is the original source of the allegations and the proprietary analysis, methodology and data synthesis detailed above.

## Specifics of the Fraud

77.    Contrary to their agreements and certifications, Defendants pledged loans they identified as PPP loans when they were not.

78.    Some of these so-called PPP loans – collateralized to secure low-interest advances – originated before Congress had enacted the emergency aid program. Others were issued before the lender applying for an advance ever issued a PPP loan.

79.    Defendants falsely certified that the loans pledged as collateral complied with the program rules. These misrepresentations allowed Defendants to falsely obtain $716.9 million in low-interest advances from the Federal Reserve to which they were not entitled, saving them millions in interest.

80.    Fifty Defendants received $716.9 million from the PPPLF Liquidity Facility collateralized by what they claimed were PPP loans, but that were written before April 3, 3020 – a time when banks could not legally approve or disburse PPP loans.

19

81.     The underlying loans used as collateral for advances were certified by Defendants as having been issued before May 1, 2020 when the Liquidity Facility prohibited the Defendants from using PPP loans purchased from other lenders.

82.     On April 22, 2020, Defendant Foresight, a lender in Plainview, Minnesota, received $400,000 in low-interest advances from the Lending Facility based on collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

83.     PPP loans serving as collateral were grouped by maturity date – two years from the date the bank originated them. With a maturity date of April 1, 2022, the underlying loans in Foresight's collateral pool were issued on April 1, 2020, two days before the SBA launched the PPP lending program and opened it to lenders.

84.     Defendant Foresight did not issue a PPP loan until April 3, 2020, two days after the disbursement date of the loans it submitted as collateral with a certification that the bank issued and owned the loans.

85.     On April 21, 2020, a second Minnesota bank, Defendant Profinium, received $734,400 in low-interest advances from the PPPLF based on collateral that the bank falsely certified complied with program regulations that required the lender to originate and own the PPP loans used as security.

86.     The two-year loans Defendant Profinium submitted as collateral were grouped by maturity date. With a maturity date of April 1, 2022, the underlying loans in the bank's collateral pool were issued on April 1, 2020, two days before banks were allowed to issue PPP loans.

87.     Defendant Profinium did not issue a PPP loan until April 3, 2020, two days
after the disbursement date of the loans it submitted as collateral and certified that the
bank issued and owned the loans used as security.

88.     On December 16, 2020, Defendant The Loan Source, a New York City
company with a small business-lending license issued by the SBA received a $56.2
million advance from the Minneapolis Fed secured by collateral the company falsely
certified complied with program regulations.

89.     Defendant TLS certified the pool of two-year loans it submitted as
collateral contained PPP loans issued in compliance with the SBA lending program. The
underlying loans securing the low-interest advance from the Federal Reserve matured on
April 1, 2022, meaning that the loans were issued two years earlier on April 1, 2020 –
two days before the SBA allowed lenders to issue PPP loans.

90.     One of a handful of companies holding an SBA Small Business Lending
Company license, Defendant TLS used the PPP lending program and fees it collected
from taxpayers as a catalyst for growth. It partnered with ACAP SME, LLC, an
aggregator, to provide loan servicing. Luke Lahaie, the chief investment officer of ACAP
SME, told the Minneapolis Fed:

> The PPP has been a catalyst of growth for our organization. By
> focusing on the PPP, we have been able to establish and grow one of
> the largest SBA-focused servicing companies (ACAP) in the U.S., as
> well as help the Loan Source become one of the country's largest
> nonbank SBA lenders.
>
> The PPPLF has been the key to executing our growth plan for the
> PPP. Without the PPPLF, we would not even have gotten started
> with our purchase or origination program.

91.    Defendant TLS adopted a business model of buying loans from banks using borrowings from the PPPLF. In May 2021, for example, TLS agreed to purchase approximately $1.8 billion in PPP loans from Northeast Bank, a Maine lender. The New York City lender and its partner claim to have originated $11 billion in PPP loans.

92.    On April 21, 2020, Defendant Atlantic of Richmond, Virginia received $10.2 million in low-interest advances from the Liquidity Facility based on collateral the bank falsely certified complied with the program's regulations.

93.    The underlying loans in Atlantic's pool matured on March 4, 2022, meaning the loans were issued two years earlier on March 4, 2020 -- three weeks before Congress enacted and the President signed legislation creating the PPP program and almost a month before SBA launched it.

94.    Defendant Atlantic did not issue a PPP loan until April 3, 2020, despite certifying that the two-year loans pledged as collateral were PPP loans issued and owned by the bank.

95.    In late June 2020, Defendant Chickasaw, a tribally-owned financial institution, received $8.8 million in low-interest loans from the PPPLF after the bank falsely certified it complied with PPPLF regulations requiring the PPP loans used as security be issued and owned by the lender.

96.    The 11 loan pools provided as collateral by Defendant Chickasaw matured between March 11, 2022 and April 1, 2022, meaning the underlying loans were issued between March 11, 2020 and April 1, 2020 – as long as three weeks before the PPP loan

program began. The underlying loans in nine of these pools were issued before Congress

enacted and President Trump signed the CARES Act creating the PPP loan program.

97.     Defendant Chickasaw did not issue a PPP loan until April 8, 2020, despite

certifying that the two-year loans pledged as collateral were PPP loans issued and owned

by the bank.

98.     This chart calculates the dates the loans pledged as collateral by Defendant

Chickasaw were issued and shows the amount of the low-interest advances:

| Maturity Date | Issue Date | Advance |
|---|---|---|
| March 11, 2022 | March 11, 2020 | $ 1,193,832 |
| March 14, 2022 | March 14, 2020 | $ 199,859 |
| March 15, 2022 | March 15, 2020 | $ 484,129 |
| March 16, 2022 | March 16, 2020 | $ 2,512,963 |
| March 17, 2022 | March 17, 2020 | $ 703,689 |
| March 18, 2022 | March 18, 2020 | $ 1,181,722 |
| March 21, 2022 | March 21, 2020 | $ 529,920 |
| March 22, 2022 | March 22, 2020 | $ 306,178 |
| March 23, 2022 | March 23, 2020 | $ 1,135,526 |
| April 1, 2022 | April 1, 2020 | $ 472,621 |
| **Total** | | **$ 8,775,970** |

99.     In mid-May 2020, Defendant CBT, a Florida bank based in Frostproof,

received $6.5 million in low-interest advances from the PPPLF based on collateral the

bank falsely certified complied with program regulations requiring PPP loans used as

security be issued and owned by the lender.

100.    With maturity dates of between March 14, 2022 and March 24, 2022, the

underlying loans in the three collateral pools provided to the Federal Reserve by

Defendant CBT were issued two years earlier, between March 14, 2020 and March 24,

2020 – days and weeks before President Trump signed the CARES Act authorizing the PPP loan program.

101.    The SBA did not launch the PPP lending program until April 3, 2020 when it allowed private lenders to originate the first loans in the emergency aid program. Defendant CBT did not originate a PPP loan until April 6, 2020, despite certifying that the bank issued and owned the loans submitted to the Federal Reserve to secure the advances.

102.    In late June 2020, Defendant Community, a preferred SBA lender, received $43.1 million from two separate low-interest advances from the Liquidity Facility based on collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

103.    With maturity dates of April 1, 2022, the underlying loans in Defendant Community's collateral pool were issued on April 1, 2020, two days before the SBA opened the PPP loan program to private lenders.

104.    Defendant Community did not issue a PPP loan until April 6, 2020, despite certifying that the PPP loans it submitted as collateral were issued and owned by the bank.

105.    Between April 21, 2020 and April 28, 2020, Defendant Cornerstone of Red Bluff, California received $63.8 million in nine separate advances from the PPPLF program based on collateral the bank falsely certified complied with program regulations the PPP loans used as security be issued and owned by the bank.

106.    Defendant Cornerstone's collateral, all two-year loans, had maturity dates between March 4, 2022 and March 16, 2022. With March 2022 maturity dates, the underlying loans securing the advances from the Federal Reserve to Cornerstone originated two years earlier, between March 4, 2020 and March 16, 2020 – weeks before Congress enacted the emergency lending program and the SBA invited lenders to participate in the PPP lending program.

107.    This chart calculates the date these loans were issued based on the maturity date and shows the amount of each advance:

| Maturity Date | Issue Date | Advance |
|---|---|---|
| March 4, 2022 | March 4, 2020 | $  1,937,400 |
| March 7, 2022 | March 7, 2020 | $     970,521 |
| March 8, 2022 | March 8, 2022 | $ 22,630,560 |
| March 9, 2022 | March 9, 2020 | $ 22,322,300 |
| March 10, 2022 | March 10, 2020 | $   5,882,502 |
| March 14, 2022 | March 14, 2020 | $   4,664,200 |
| March 15, 2022 | March 15, 2020 | $   4,388,000 |
| March 16, 2022 | March 16, 2020 | $     937,300 |
| Total | | $ 63,752,283 |

108.    Defendant Cornerstone did not issue its first PPP loan until April 3, 2020, despite certifying that the two-year loans pledged as collateral were PPP loans issued and owned by the bank.

109.    In 2020, Cornerstone posted net income of $5 million. A year later, in 2021, its profit increased by 70 percent to $8.5 million. As of December 31, 2020, it had assets of $497.4 million.

110.     On June 19, 2020, Dakota, a state bank in North Dakota, received $5.1 million from the Federal Reserve liquidity facility secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

111.     With a pool maturity date of March 14, 2022, the underlying loans in Defendant Dakota's collateral pool were issued on March 14, 2020, two weeks before the President signed legislation authorizing the CARES Act and 20 days before the SBA launched the PPP lending program.

112.     Defendant Dakota did not authorize its first PPP loan until April 5, 2020, three weeks after the disbursement date of the loans it submitted as collateral with a certification that the bank issued and owned the loans.

113.     In April and July 2020, Defendant FMB of Lakeland, Georgia received $10.5 million from the Liquidity Facility secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the bank.

114.     With maturity dates of April 1, 2022, the underlying loans in Defendant FMB's collateral pool were issued on April 1, 2020, two days before the SBA launched the PPP lending program.

115.     Defendant FMB did not authorize a PPP loan until April 4, 2020, three days after the disbursement date of the loans it submitted as collateral with a certification that the bank issued and owned the loans.

116.    In late April and early May 2020, Defendant First State received five separate advances totaling $28 million from the PPPLF secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans pledged as security be issued and owned by the lender.

117.    With maturity dates in February and early March 2022, the underlying loans in Defendant First State's collateral pools were issued two years earlier, between February 29, 2020 and March 7, 2020, weeks before Congress approved the lending program and a month or more before the SBA launched the PPP lending program.

118.    This chart calculates the date these loans were issued and shows the amount of the Liquidity Facility advances:

| Maturity Date | Issue Date | Advance |
|---|---|---|
| February 28, 2022 | February 29, 2020 | $ 11,002,600 |
| March 3, 2022 | March 3, 2020 | $ 4,311,300 |
| March 4, 2022 | March 4, 2020 | $ 8,211,089 |
| March 4, 2022 | March 4, 2020 | $ 3,837,700 |
| March 7, 2022 | March 7, 2020 | $ 642,800 |
| Total | | $ 28,005,489 |

119.    Defendant First State made its first PPP loan on April 3, 2020, a month or more after the disbursement date of the loans it submitted as collateral with a certification that the bank issued and owned the loans.

120.    First State recorded undivided profits of $17 million in 2020 with assets of $258.1 million.

121.    In late April and early May 2020, Defendant First Community received $12.9 million in eight subsidized financial advances from the PPPLF based on collateral

the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

122.    With maturity dates between March 15, 2022 and March 22, 2022, the underlying loans in Defendant First Community's collateral pools were issued two years earlier, between March 15, 2020 and March 22, 2020 – some 12 to 16 days before PPP lending began and a week before the signing of the law creating the CARES Act authorizing the program.

123.    This chart calculates the issue date and shows the amount of each credit advance:

| Maturity Date | Issue Date | Advance |
|---|---|---|
| March 15, 2022 | March 15, 2020 | $ 3,712,781 |
| March 16, 2022 | March 16, 2020 | $ 2,161,890 |
| March 17, 2022 | March 17, 2020 | $ 3,592,426 |
| March 18, 2022 | March 18, 2020 | $ 1,229,186 |
| March 21, 2022 | March 21, 2020 | $ 415,177 |
| March 21, 2022 | March 21, 2020 | $ 849,036 |
| March 22, 2022 | March 22, 2020 | $ 926,736 |
| March 23, 2022 | March 23, 2020 | $ 76,512 |
| Total | | $ 12,963,744 |

124.    Defendant First Community did not approve its first PPP loan until April 8, 2020, weeks after the disbursement dates on the loans it submitted as collateral with a certification that the bank issued and owned the loans.

125.    In 2021, First Community's assets increased by 19 percent, from $473.9 million to $564.4 million.

126.    In May 2020, Defendant Flatwater, a family-owned bank in Gothenburg, Nebraska, received $10.8 million in low-interest advances from the Liquidity Facility based on 11 separate loan pools the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

127.    With maturity dates between March 4, 2022 and March 18, 2022, the underlying loans in Defendant Flatwater's collateral pool were issued two years earlier, between March 4, 2020 and March 18, 2020. weeks before Congress enacted and the SBA opened the emergency lending program to lenders.

128.    This chart calculates the issue date of the loans and shows the amount of each advance:

| Maturity Date | Issue Date | Advance |
|---|---|---|
| March 4, 2022 | March 4, 2020 | $    600,700 |
| March 7, 2022 | March 7, 2020 | $    497,600 |
| March 10, 2022 | March 10, 2020 | $  3,242,500 |
| March 11, 2022 | March 11, 2020 | $  2,297,500 |
| March 11, 2022 | March 11, 2020 | $  1,579,100 |
| March 11, 2022 | March 11, 2020 | $  1,477,600 |
| March 14, 2022 | March 14, 2020 | $    364,800 |
| March 17, 2022 | March 17, 2020 | $    235,600 |
| March 18, 2022 | March 18, 2020 | $    194,800 |
| March 18, 2022 | March 18, 2020 | $    182,500 |
| March 18, 2022 | March 18, 2020 | $    142,000 |
| **Total** | | **$ 10,814,700** |

129.    Defendant Flatwater did not authorize its first PPP loan until April 4, 2020, almost three weeks after the disbursement dates of the loans it submitted as collateral with a certification that the bank issued and owned the loans.

130.    Flatwater reported net interest income of $8.2 million in 2020 and assets of $216.7 million.

131.    On April 21, 2020, Defendant Georgia Primary, a state-chartered institution in Atlanta, received an $18.1 million advance from the Liquidity Facility secured by collateral the bank falsely certified complied with program regulations requiring PPP loans used as security be issued and owned by the lender.

132.    With a maturity date of April 1, 2022, the underlying loans were issued on April 1, 2020, two days before the SBA launched the PPP emergency lending program and opened it to lenders.

133.    Defendant Georgia Primary did not issue a PPP loan until April 3, 2020, two days after the disbursement date of the loan it submitted as collateral with a certification that the bank issued and owned the loans.

134.    On September 25, 2020, Defendant InsBank of Nashville, Tennessee received a $10 million advance from the Liquidity Facility secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

135.    With a maturity date of April 1, 2022, the underlying loans in Defendant InsBank collateral pool were issued on April 1, 2020, two days before the PPP lending program began.

136.    Defendant InsBank did not authorize a PPP loan until April 5, 2020, four days after the disbursement date of the loans it submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

137.      On April 22, 2020, Defendant Legacy, a Missouri institution with six locations in two states, received a $17.1 million advance from the PPPLF secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

138.      With a maturity date of April 1, 2022, the underlying loans in Defendant Legacy's collateral pool were issued on April 1, 2020, two days before the SBA launched the PPP lending program and opened it to private lenders.

139.      Defendant Legacy did not authorize a PPP loan until April 3, 2020, two days after the disbursement date of the loans it submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

140.      Defendant Lexicon, a Las-Vegas-based financial institution, acknowledged in a report to shareholders that fees from the PPP loan program drove its 2021 profits, explaining that it would have lost $1.5 million before taxes without the fees from the taxpayer-subsidized PPP loan program. The low-cost advances from the Federal Reserve also increased Lexicon's profit on its PPP loan transactions.

141.      In late April and early May 2020, Defendant Lexicon received $69.4 million in advances from the Liquidity Facility secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

142.      With maturity dates of April 1, 2022, the underlying loans in Defendant Lexicon's collateral pool were issued two years earlier, on April 1, 2020, two days before the SBA launched the PPP lending program.

31

143.    Defendant Lexicon originated its first PPP loans on April 5, 2020, four days after the disbursement date of the loans it submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

144.    This chart calculates the loan issue date and shows the amount of each advance to Lexicon:

| Maturity Date | Issue Date | Advance |
|---|---|---|
| April 1, 2022 | April 1, 2020 | $46,768,699 |
| April 1, 2022 | April 1, 2020 | $22,669,295 |
| Total | | $69,437,994 |

145.    On December 17, 2020, Defendant Liftfund, a non-profit operating as a community development financial institution and a development corporation, received $5.7 million in five separate low-income advances from the PPPLF secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

146.    With maturity dates between March 11, 2022 and April 1, 2022, the underlying loans in Defendant Liftfund's collateral pools were issued two years earlier, between March 11, 2020 and April 1, 2020, before the SBA opened the PPP loan program to private lenders.

147.    Defendant Liftfund did not issue a PPP loan until April 13, 2020 five days after the disbursement date of loans in one pool and three weeks after the disbursement date of loans in a second pool submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

148.     Defendant Merchants of Carmel, Indiana secured $79.5 million in two low-interest advances from the Federal Reserve secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

149.     With maturity dates of April 1, 2022, the underlying loans in Defendant Merchants' collateral pool were issued on April 1, 2020, just days before the SBA opened the PPP loan program to lenders.

150.     Defendant Merchants did not authorize a PPP loan until April 3, 2020, two days after the disbursement date of the loans it submitted to the Federal Reserve with a certification that the bank issued and owned the loans.

151.     On May 11, 2020, Defendant MVB, a state-chartered institution in California, received $49.9 million advance from the PPPLF secured with collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

152.     With maturity dates of April 1, 2022, the underlying loans in Defendant MVB's collateral pool were issued on April 1, 2020, two days before the PPP lending program began.

153.     Defendant MVB did not authorize a PPP loan until April 3, 2020, two days after the disbursement date of the loans it submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

154.     The bank's corporate parent, Mission Valley Bancorp, recorded the most profitable year in its history in 2021, with net income of $5 million or $1.50 a diluted

share, an increase of more than 115 percent compared to the $2.3 million or $0.71 a diluted share for the year ending December 31, 2020. In 2021, the financial holding company told its shareholders a $1.8 million rapid response grant from the U.S. Treasury coupled with the bank's growth and diversification doubled its non-interest income.

155.     On May 15, 2020, Defendant Osgood received a $5.5 million low-interest advance from the Liquidity Facility secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

156.     With maturity dates of March 17, 2022, the underlying loans in Defendant Osgood's collateral pool were issued on March 17, 2020 -- 10 days before President Trump signed the legislation creating the emergency lending program into law and two weeks before the SBA launched the PPP loan program.

157.     Defendant Osgood did not authorize a PPP loan until April 6, 2020, three weeks after the disbursement date of the loans it submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

158.     On April 23, 2020, Defendant TBC, an Idaho Falls community bank, received $30.7 million in low-interest advances from the Federal Reserve secured by collateral the bank falsely certified complied with program regulations requiring that the PPP loans used as security be issued and owned by the lender.

159.     With maturity dates of April 1, 2022, the underlying loans in Defendant TBC's collateral pool were issued on April 1, 2020, days before the SBA opened the PPP loan program to private lenders.

160.     Defendant TBC did not issue a PPP loan until April 3, 2020 two days after the disbursement date of the loans it submitted to the Federal Reserve as collateral with a certification that the bank issued and owned the loans.

161.     On May 8, 2020, Vibrant, a credit union with $1 billion in assets and branches in Iowa, Illinois and Indiana, received a $130.2 million in low-interest advance from the PPPLF secured by collateral the bank falsely certified complied with program regulations requiring the PPP loans used as security be issued and owned by the lender.

162.     With maturity dates of April 1, 2022, the underlying loans in Defendant Vibrant's collateral pool were issued two years earlier, on April 1, 2020, days before the SBA opened the emergency aid loan program to private lenders.

163.     Defendant Vibrant did not authorize a PPP loan until April 4, 2020, three days after the disbursement date of the loans it submitted as collateral to the Federal Reserve with a certification that the bank issued and owned the loans.

## DAMAGES

164.     Defendants, all sophisticated lenders with years of financial experience, knew or should have known that the collateral they submitted to the Federal Reserve violated the terms and conditions of the program designed by the Minneapolis Fed to enable private lenders to support small businesses struggling through the pandemic.

165.     The Minneapolis Fed crafted the program to incentivize private lenders to participate in the PPP program by providing non-recourse, low-interest loans that could increase their profit and reduce their risk.

166.     The program was straightforward: Lenders could obtain low-interest advances from the Federal Reserve secured by PPP loans they previously had originated and owned. The amount of the advance was equal to the value of the PPP loans serving as collateral. As an added benefit, these advances from the Federal Reserve to private lenders relieved their institutions from liability if PPP borrowers defaulted.

167.     At the height of the pandemic, 50 sophisticated Defendants took advantage of taxpayers by borrowing $716.9 million from the Federal Reserve at low rates secured by what the lenders certified as qualifying PPP loans. However, these so-called PPP loans were issued before the SBA launched the emergency aid program and, in some cases, before Congress passed and the President signed into law the CARES Act, which authorized the PPP lending program.

168.     Defendants electronically transmitted these false claims and certifications to the Federal Reserve. Transmittal of these false claims constitutes wire fraud.

169.     Under their agreements with the Federal Reserve, financial institutions that breach any of the representations, warranties or covenants made under the PPPLF agreement or engage in fraud or misrepresentation in connection with the advances received from the Federal Reserve are responsible for the debt.

>   Notwithstanding any provisions of the PPPLF Agreement to the contrary, all Advances made to the Borrower pursuant to the PPPLF shall become a recourse obligation if, in the sole discretion of the Reserve Bank, the Borrower (i) has breached any of the representations, warranties or covenants made under the PPPLF Agreement or (ii) has engaged in any fraud or misrepresentation in connection with any Advance or any request to obtain an Advanced under the PPPLF.

170.     As a result of their fraudulent representations to the Federal Reserve, Defendants received $716.9 million in advances secured with collateral that did not meet the strict requirements of the discount lending program. Defendants were not entitled to these advances.

171.     These fraudulent representations by Defendants provided advances that were about 40 percent lower in cost than available from other lending sources. As such, Defendants pocketed millions more in associated interest subsidized by taxpayers to which they were not entitled.

**COUNT I**

**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729 et seq.**

172.     Relator re-alleges and incorporates by reference every allegation contained in the paragraphs above as though fully set forth herein. This count sets forth claims for treble damages and civil penalties under the FCA.

173.     As described in greater detail above, Defendants failed to comply with the provisions set forth by the Federal Reserve PPPLF. Defendants fraudulently represented that PPP loans they provided served as the needed collateral to secure low-interest advances when they did not. As lender-borrowers were required to provide a list of SBA PPP loans used as collateral, they knew or should have known their pledge and certifications were fraudulent. These representations constitute a false claim under the FCA.

174.     Under the FCA, Defendants have violated:

i.   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval;

ii.  31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and

iii. 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government.

175.   Because of the false claims made by Defendants, the United States has suffered and continues to suffer damages, and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a.  This Court enter an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

b.  This Court enter an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c.  This Court enter an order requiring Defendants to cease and desist from

violating the FCA;

d.  This Court enter an order requiring Defendants to pay all expenses, attorney's

fees and costs associated with this action;

e.  This Court enter an order paying Relator the maximum statutory award for its

contributions to the prosecution of this action; and

f.  Any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Respectfully submitted,

HALUNEN LAW

Of Counsel:
(*pro hac vice* application forthcoming):
Dave Scher
Hoyer Law Group, PLLC
1300 I St., Suite 400E
Washington, D.C.  20004
Tel.: (202) 997-8227
dave@hoyerlawgroup.com

Susan M. Coler, (MN No. 217621)
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099
coler@halunenlaw.com

*Lead Counsel for Relator*

*Minnesota Counsel for Relator*

Dated:  July 26, 2024